25-4-1-2-1 is ready. We'd like to hear from you as well. Okay, Mr. Holditch, whenever you're ready, no rush. May it please the Court. Good morning. My name is Michael Holditch. I'm here on behalf of the appellants, in this case the Indian Tribe of the Uintah-Noray Reservation. My intent and hope is to preserve four minutes for rebuttal in this matter. Your Honors, we're here this morning on the singular issue of the issue on appeal, which is whether the Ute Indian Tribe has demonstrated an injury, in fact, sufficient to raise a justiciable challenge to United States approval and execution of a consent decree for alleged Clean Air Act violations on the Tribe's Uintah-Noray Reservation and tribal lands thereupon. As a jurisdictional issue, the Tribe's Article III standing is reviewed by this Court de novo. And in this de novo review, this Court should find that the Tribe has shown that the acts and omissions of the United States amount to not just one, but three separate and independently viable Article III injuries suffered by the Tribe. These include an intrusion upon the Tribe's sovereign interests to uphold its inherent sovereignty, excuse me, its inherent authority as a sovereign nation within its reservation boundaries, an intrusion upon the Tribe's legally protected quasi-sovereign interests to uphold the interests of its membership in its territory, and harms to the Tribe's economic interests as an energy mineral production dependent tribe. Now, when you say they're independent, I thought that they were independent as well until I got to page 19 of your reply brief when you said the economic harms are incidental to and flow from the sovereign and quasi-sovereign harms alleged from the United States failure to properly engage and What did you mean by that? Because I thought you were then saying, well, if we reject your arguments about a sovereign interest or quasi-sovereign interest that those envelop the economic injury argument, that the economic injury isn't a third separate argument. What did you mean by that? We would stand by our assertion that there is an independent economic argument here. I do believe when we refer to the sovereign status of the Tribe in the United States trust responsibility, what we're referring to really is the aspect of the economic harm that is sort of the lost opportunity from the ability of the consent decree to be a mechanism. And there is precedent for this that's specifically applicable to the Indian tribe to actually invest in the tribe as a sovereign regulator of the environment. For example, in the 2012 consent decree with Questar Gas Management, there was an actual fund that was up to Treasury. Instead, there's a lost opportunity for actual economic investment in the tribe's ability to manage these natural resources and these environmental issues on its own as a matter of self-governance. And so I think that the tie-in there, and if it's not artfully articulated in the brief, hopefully this will provide the clarity necessary, is that the trust responsibility to uphold the tribe's right to self-government, it's really inextricable from that. So I'd like to stand on the briefing and make four kind of critical points of distinction for the purposes of today. And I think that these will help illustrate kind of the salient issues and elucidate the merits of the tribe's position on standing. And the first point of distinction that I want to raise is quite simply the distinction between the threshold issue of standing that's before the court today and the substantive merits of the tribe's claims. And the reason I raised this issue at the outset is because the United States has repeatedly placed great emphasis on the assertion that the tribe cannot have an injury to its sovereign or quasi-sovereign interests based on an alleged lack of consultation, because the tribe has in fact received consultation from the United States in the form of what they allege to be a 2021 virtual consultation on a number of enforcement actions. And notwithstanding the fact that the tribe's gripe with the United States does not begin and end with consultation, particularly not the issue of black and white issue of whether or not consultation did or didn't occur, it doesn't speak to the sufficiency of that consultation, nor does it speak to the issues of whether the United States properly gave priority to the tribe's environmental goals and objectives, as well as a real voice for input, meaningful input into this enforcement process and subsequent development of recourse. Counsel, I'm sorry to interrupt. You just said that the tribe's sovereignty interest doesn't end with consultation. That's correct. And again, setting aside whether or not the consultation here was adequate or sufficient, are you referring to what then? What other sovereignty interests have you raised in addition to consultation? The consultation itself is not the interest. It was the lack of government to government consultation, among other shortcomings in the interface with the tribal government for enforcement actions taking place on the tribe's sovereign homeland. But I think your question is. Well, that's what I'm getting at. So what else besides consultation gave rise to your injury here to your sovereignty interest? It would be the United States' trust obligation to uphold and recognize the tribe's sovereign management authority over its reservation homeland. Now, that's partially embodied through government to government consultation, but it doesn't begin and end in what we like to call sort of the formality of a check to the box consultation. So where does it end? That's what I'm getting at. So understanding the general trust responsibility that the U.S. has to the tribes. What else is required here beyond just we recognize your sovereignty interest over the natural resources on your land? We also have an interest in regulating those because Congress has given us that authority. And so we're going to work with you and consult with you. What else has been alleged here as an injury that I'm missing that goes beyond that type of consultation and sort of respect, if you will, for the sovereignty? A complete government, a meaningful government to government consultation would, I think, arguably embody the full panoply of the United States' obligations here. But separate from consultation and really encapsulating consultation is the trust responsibility. And that requires not only engaging on a government to government basis with the tribe, but also giving meaningful prioritization to the goals and priorities that the tribe says. Now, we are not arguing for a departure from the EPA's enforcement authority under the Clean Air Act. We're certainly not trying to do that, nor are we trying to say that the tribe should be deemed the primary regulator of the Clean Air Act issues on its reservation. There's nothing here that and there's no argument being made that the tribe is trying to supplant the Environmental Protection Agency in any way, shape or form. What the tribe is asserting here is that there is built in flexibility in how the EPA develops recourse for Clean Air Act violations. That flexibility lends itself to exercising its trust responsibility by not just consulting with the tribes, but also prioritizing the type of recourse that would really benefit the tribe as a proponent of responsible development on its reservation. When I say responsible development, I mean, of course, the tribe depends almost exclusively on the economic revenues from oil and gas development on its reservation. But at the same time, it recognizes that its membership, you know, those are the ones that have to localize, incur the localized impacts of Clean Air Act issues or Clean Water Act issues as the case may be. And so when we say responsible development, we mean achieving that balance and the tribe in its position as a sovereign nation and steward of these lands is the one that's in the best position to do that. And at the very least, the EPA should recognize that pursuant to the flexibility and how it develops its recourse under the Clean Air Act and give meaningful opportunity for the tribe to have a voice in that process and a seat at that table. Can I ask about the economic interests? Where in your pleading to intervention did you allege specific facts that the fines and modification costs that were going to be levied have incurred some direct loss of revenue to the tribe? On that specific issue, it would only be insofar as the tribe is standing on its own two feet and saying, this is not an injury that's incurred by an industry partner of ours that we're putting forward on their behalf. This is an injury to the oil and gas economy at large that is really the driver of the tribe's economic well-being. But isn't that only true if the company sort of passes on those costs by a loss of revenue, if you will? Well, there's a number of ways in which that could sort of manifest. It could be the precedent that it sets among industry partners that sort of drive the reservation economy. But I think... Could you elaborate on that? I didn't understand what you said. Oh, well, I think that the United States has asserted that kind of an artificially narrow interpretation of the tribe's argument that what we're saying is that Four Point, which is the producer at issue here, is necessarily going to curtail its oil and gas operations if it receives a fine. And that's too speculative. But I think that any time... It's a fair assertion that any time there are economic burdens on the drivers of a larger oil and gas economy, then that can have, without going into a lot of specifics about how exactly that manifests, that will rise to the level of an economic harm. Now, I think that only speaks to... But isn't it your obligation in the pleading stage to go into those details as to how it manifests as the economic harm? Well, I think the economic harm is largely the lost opportunity that I discussed previously. So that would be the fact that there is a distinct opportunity here to use this enforcement process to actually invest funds that support and enhance responsible development, but also economic well-being within the tribe's reservation boundaries, instead of just having $5.5 million in fines that go up to Treasury or to be used for whatever nebulous purposes they're used for. That's really, I think, the best encapsulation of the economic interest at stake here. Is that in the complaint? That is in our motion to intervene, yes. Okay. In your proposed petition for intervention, where would I find that? I don't have a page number, but I can certainly... That's all right. ...try to find that for rebuttal. And I do see that into my rebuttal time now. Paul, why don't you stop this? David. All right, thank you. Thank you. May it please the Court. You may want to just lower that a little bit. It helps with our recording system. Thank you. May it please the Court. Brian Toth from the Department of Justice, representing the United States as plaintiff-appellee. The district court correctly denied the tribe's motion to intervene in this civil enforcement action that had already been settled with a consent decree that the district court had approved. The district court correctly held that the tribe has failed to demonstrate that it has Article III standing, specifically that it proved that it would suffer an injury in fact to its concrete interests. And there's no dispute that, as an intervener here, the tribe is seeking additional relief beyond what the parties already have sought and that it therefore needs to demonstrate that standing under Town of Chester. So the only dispute is over whether it's made that adequate showing through its pleadings, through its proposed motion to set aside the consent decree. And I can go through each of the three categories of the tribe's underlying concrete interests that it identifies, sovereign, quasi-sovereign, and economic interests, and explain why the district court was correct in determining that the tribe hasn't made a showing as to any of those categories. Before I do that, I want to set the stage a little bit and offer the court an alternative ground for affirmance that we present at the beginning of our brief. I wanted to dispel some confusion about whether we're asking the court to get into the merits. Specifically, we think the factual record here, even though it was at essentially the pleading stage of intervention, is well-developed enough with enough correspondence in the record to demonstrate that the tribe clearly had an opportunity to talk with EPA and communicate with EPA and consult with EPA about the civil enforcement action. So for it to come in and claim as a matter of fact that it would suffer the procedural, it has suffered the procedural injury of a failure to consult, we think is factually incorrect. Well, why is that a merits argument? So I don't believe it is. I think there's some overlap with the merits. But I think it goes to whether they've demonstrated their Article III standing as a matter of fact. But as you know, one of the black letter principles of injury in fact is that you credit the allegations of the complainant. Yes, I understand. Okay, well, we're going to go beyond the proposed petition and intervention, and we're going to present evidence that we did just what they're complaining about. Well, that seems contrary to just a very elementary principle of how a court evaluates a facial attack to standing. So we think this aspect of our brief on appeal is not a facial attack. It's a fact-based attack on the record as it was before the district court. Okay, let's say it's a fact-based attack, but if they had lost, if there was no consultation, this argument wouldn't counter that. You're saying, well, we didn't do what they're saying, but how is that a standing argument? Maybe you've already said it. I don't understand the distinction that you're drawing between a merits argument and a fact-based challenge to standing. So there are two different types of interests they have to demonstrate. They're alleging a procedural injury, right? So under Summers against Earth Island Institute, it's not enough that they just allege that there was a failure to consult. They have to also allege that that procedural interest was protected by some underlying concrete interest. That's the sovereign, quasi-sovereign economic harms that we're spending most of our time arguing about. We're presenting an alternative ground that we think is narrower than saying the tribe can't demonstrate these broad categories of injury to say on the facts here they haven't even shown that they would suffer that first predicate procedural injury because their allegation is there was no consultation, period. It's an APA challenge for a failure to act. It's not a challenge to final agency action that would be evaluated as the adequacy of consultation. It's, you know, the blanket allegation is there was no consultation, and we think that's adequately refuted by the facts. Yeah, but I'm sorry to maybe beat this dead horse, but when you say the facts here, you know, I understood your brief to discuss some levels of consultation that are not part of their motion to intervene or the pleadings that support it. So, you know, to maybe ask the same question Judge Bacharach just asked you, which is how are we to consider those facts? So I think, you know, the parties did, they were asked to brief standing by the district court, and they attached various correspondence letters and email and so on to the pleadings. And because this is a jurisdictional inquiry, the court can make a limited inquiry into the facts if it wants. So is it your view then that the facts or the record that was presented in your response brief was all part of your response to the district court's order to brief standing? Yes. So there's no, there's nothing extraneous in your response brief? Right, it was all submitted to the district court. It's all part of the record on appeal. And the correspondence, I mean, the tribe can characterize how it wishes, and they can say, well, it wasn't adequate to give us a seat at the table. They didn't meet at the reservation. They met virtually, despite that it was during COVID. You know, they can talk about why they don't think it was enough, but it's up to the court to, you know, look at the correspondence and determine. And you can. You don't have to do this, but I'm just providing another way for the court to decide the case. Can I ask you a somewhat related, somewhat unrelated question? And you can decline to answer it if you want. I just have a practical question. Like, why are we here? I mean, you have a policy, December 7, 2023. It's called EPA Policy on Consultation and Coordination Tribes. And so your policy, the reason you say, I presume, that we consulted is, that's exactly what you're required to do by your policy. And you're bound by your policy. They say, well, we want a court to order EPA to do that. Well, in your, I think you would privately acknowledge, maybe not in a public courtroom, that we have a policy that requires us to do just that. Why don't you just consent to do what your policy requires? Why make a federal case out of it? I hear what you're saying. I mean, we believe that we did comply with the policy. I get that. But only one is, so they say, my question is, okay, then the district court enters an injunction saying, EPA, abide by your policy. And you say, okay, now we have contempt action or something. And then the question is, well, whether or not EPA disobeyed the policy. But you're saying, okay, well, don't enter an injunction. Don't require us to do what we acknowledge under our policy that we are already obligated to do. That's what I don't get. So the details about, now we are getting into the merits of the claim, and I want to answer your questions. We didn't brief this, but our position is that we don't think this policy applies to a claim in civil litigation. It applies at the administrative stage where EPA is notifying the tribe that it's conducting compliance, excuse me, enforcement compliance and monitoring before it goes on the reservation, which it did here. It did notify the tribe of that. Once it gets into civil litigation, you know, what the tribe wants, you heard them say, they want a seat at the table, they want to be negotiating with the United States and with the defendant ovintive, now four point, about what the consent decree must contain. And because they aren't a party, they have not brought a claim of their own. We have policies, the Department of Justice has a policy, EPA has a policy about sharing non-public information with entities that are not parties to litigation. Even if they are tribes. They may have done that, but I just don't see you had a right to that. Certainly not under that memorandum of understanding you don't have a right, because that expressly says it did not create any right or benefit, substantive or procedural.  So you can't claim any right there, and it seems to me you have to do just what you tried to do. You're saying we're not claiming any rights under the understanding. We're claiming some rights as a nation and in standing of the relationship of our members. And so that's why we're focusing on those issues. Okay, well I'm happy to turn to those and address each of those. And I think the one, you know, taking them in turn, the sovereign interests that they identify are from the Alfred L. Snapp and Sons case. They say they are limited to creating a tribal code and enforcing it against entities under their jurisdiction. Well, certainly the defendant, Oventive, was under their jurisdiction in terms of when it operated on the tribal reservation. But the United States was not. And basic principles of intergovernmental immunity, as they would apply to a state, trying to, you know, the Commonwealth of Maryland couldn't tax the federal bank. So, two, a tribe cannot impose its own tribal code on the United States. I think that's easily taken care of. The interests they're identifying also do not relate to recognition of a sovereign in terms of recognizing borders, which is what the Supreme Court spoke of in Snapp. That's not really at issue. So none of these special interests they seem to be asserting justify an interest sufficient to even make a claim for intervention. They've got to make their own proof of damages here. I don't see that any of those three criteria, sovereign nation, quasi-sovereign nation, or proprietary interests are impacted. We would agree. You know, representing the United States, we would agree that the tribe has not made the requisite showing here and that the district court correctly denied their request for intervention. But isn't that where the analysis of this appeal is going to lie? You know, very likely. That's where the district court spent most of its time. I just wanted to give the court another opportunity to, you know, decide the case on more narrowly if it wished. It raises some complications as to whether we're inviting the court to reach the merits. If the court is apprehensive about that or thinks that that is what we're trying to do, having the court affirm on the lack of any of these underlying concrete interests. Well, as I understand the tribe's argument, it's one based on this memorandum of agreement, which Judge Ebell just pointed out I think doesn't confer rights, but also the general trust responsibility. And as I understand their core issue here is they don't believe there was meaningful consultation, but you also just heard them say that really it's that the interests of the tribe were not prioritized at all. And the United States goes to this, what's oventive now four point, enters a consent decree where the tribes really mention once out of hundreds of pages and very minimally. And, you know, on the economics of this, the obvious point to me is that there is all this money that the oil and gas company has to pay to the United States and Utah, and it cuts out the tribe. And so they're saying, look, you are taking money from our industry partner, who's operating here under our sovereignty, and we're not part of the deal. And so just at its core, as I wrap all that together, as it's been alleged, why isn't that enough to confer an injury? Because to get to the economic point, I mean, you heard my friend attempt to explain the linkage between the actions and the consent decree that were the subject of the underlying litigation and what effect it might have on the tribe. And he had difficulty doing that up here at the podium. We haven't seen it in the briefs either. We didn't see it in the district court. We didn't see the linkage other than this general allegation that, yes, the tribe derives general revenue. It may have royalties. It may have other fees that it imposes. But, you know, how does that relate to oventive? How does that relate to the facilities that are at issue in the complaint? How is oventive going to react to the consent decree that it negotiated voluntarily? Well, yeah, I think you're answering a question, with all respect, that my colleague hasn't asked. So, in other words, I think that the nation is making two separate economic injury arguments. Certainly the discouraging the industry partners from investing in the oil and gas industry on reservation property, that's certainly one. But I think my colleague is asking, well, isn't there just an obvious nexus that they could have taken this $5.5 million and said, well, we're going to give it to the tribe in order to, you know, increase its environmental awareness, you know, initiatives on reservation land and the like. In other words, to use some of that funding to benefit the tribe. I think that's what he's asking. So the tribe could have attempted to assert, and the EPA invited the tribe to brainstorm with it, whether it had grounds to assert its own claim under tribal law against oventive. That would have been one option for it to become a party to the case, to bring its own claim, like the state of Utah did, along with the United States, against the defendant here. And the tribe demurred. What would you say its interest is? Was the tribe a landowner of the reservation also, or was all the land owned by private Indian rights? Who owned the land that was impacted by this drilling? So some of it is a complicated question. I don't know the answer to all the different – I mean, the answer is that it depends on the different parcels for the different facilities. There are like 140 different facilities. What if the owner of some of the land was impacted by the drilling? I don't believe it was on – I don't know the answer to your question. I know that some of the facilities are on land that is within the tribe's jurisdiction. That's where the United States brought the claims. There were others that were owned privately outside Indian country. Those fall to the state of Utah. So it wasn't that the United States was enforcing against the tribe here, but it was enforcing against facilities that were located on land within the tribes, within Indian country. That may not clear it up entirely. It's a complicated answer. It's mixed ownership. There's checkerboarded ownership within the Indian – within the reservation. So that's why Utah and the United States are both involved in the enforcement decree. I'm out of time, but I'm happy to answer any further questions. Okay, thank you. Thank you very much, Your Honors. I'd just like to make a few quick points. First, on the inquiry that was just raised about the location of the facilities that are subject to the enforcement action, there were some facilities that were outside of the reservation altogether. There were some that were on tribal trust land, so that is land that is beneficially owned by the Ute Indian tribe and unquestionably within their jurisdiction. And there's even some in between that are on what are called Indian country lands, which is – that's kind of idiosyncratic to the Ute Indian tribe. There's the Utah series of cases, but the upshot of that is that there are lands that aren't tribal trust lands, but they still fall within the exclusive regulatory jurisdiction of the tribe, regardless of the fact of their ownership. Another issue that I wanted to raise is this MOA, the Memorandum of Agreement, because I think it's important and it wasn't – I wasn't able to address it in my initial argument here. I want to make clear, and we are not disputing in any way, shape, or form, the provision in that MOA that disclaims any right to bring a claim for a breach of that MOA, a breach of contract, whatever theory it falls under. And so I want to make clear because really it has very limited relevance to this standing inquiry. Its relevance is primarily due to the fact that we think the district court afforded too much weight to this MOA in making the determination that the tribe lacks standing because of those non-enforceability provisions. What the tribe's position is is that this MOA is sort of an embodiment of existing federal law, that the EPA wears two hats when they're operating on the reservation. They have their enforcement hat and then they have their trust hat, and one does not subsume the other or truncate the other. And so what the MOA does is provide kind of a mutually assented protocol for how EPA would wear those two hats in a manner that was reconcilable with both its regulatory enforcement functions and its trust responsibility. Now that's not really relevant to the issue of standing. It came up in our motion to intervene in proposed pleading and intervention because it did create this sort of mutually assented protocol, did create a, I think, reasonable expectation on the part of the tribe as to the compliance with that protocol that we think is relevant to the APA claims that underlie the, or overlie, I guess I should say, the tribe's pleading and intervention. We think it has relatively limited relevance to the issue of standing and that we also think that the tribe has a viable claim even if the MOA was not cited at all. So I want to make that clear because in some ways maybe it shouldn't have been cited because of the sort of improper amount of weight that it was given in the standing inquiry. Counsel, can I ask your response to an argument the EPA just made, which is when the enforcement began, there was discussions with the tribe. They published a public notice of the consent decree in the Federal Register and the tribe, of course, sent a public comment which essentially does invoke the MOA repeatedly and says they're not taking our interest into account. We object strongly to this consent decree. But you were invited to join the enforcement action, the tribe was. Does that factor, and obviously declined to do that, instead now is coming in to intervene on the back end to say wipe away this consent decree that's been entered. Does that factor into our analysis at all? Well, the tribe did not have any interest in, the ability of the tribe to enter an appearance or infiltrate the case as a party would be based on its rights under the enforcement or civil supervision of the Clean Air Act. It really didn't have any interest in enforcing the Clean Air Act against its industry partner. It was more interested in holding the United States to its duties vis-a-vis the tribe as kind of an intergovernmental, inter-sovereign relationship. I suppose it's possible that they could have done that through, in kind of a, you know, it would be kind of an indirect way through intervening as a party into this original Clean Air Act enforcement action. But that's why they're intervening in that now is because they didn't do that originally because that really wasn't their intent was to enforce against their industry partner. They just wanted a seat at the table. And if that terminology is, you know, is unpalatable to the United States, maybe, you know, what we're asking for is a meaningful voice and prioritization of the tribe's goals and priorities here. And so they could have done that, but they, like I said, they didn't have a lot of interest in asserting claims against 4.0 or VINTA as it was at that time. I just have one question. Is this a factual challenge? Well, they're, I'm sorry, are you asking if they're challenged to, or they're? Is their challenge a factual challenge to standing? Yeah, well, it seems to me that the United States is arguing that. It's not a facial challenge based on the complaint. It's a factual challenge. It's fine. I think it's both. I certainly think that United States arguments as to whether the record supports whether or not consultation took place is a factual challenge. And I think it falls short as a factual challenge because it doesn't get to the meat of the issue, which is something that will be decided later on down the road, which is whether that alleged consultation was sufficient. David, do you have any questions? All right. Thank you very much. This matter will be submitted. I do want to express appreciation for both counsel. Your briefs and your arguments were very well done, and we certainly appreciate your excellent advocacy. Court is in recess until 9 o'clock tomorrow.